AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Rachel Smith<br><br>*Defendant(s)* | Case No. 8:19MJ1788 TGW |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __May 8, 2019__ in the county of __Pinellas__ in the __Middle__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 and 841. | conspiracy to possess with intent to distribute fentanyl |

This criminal complaint is based on these facts:

☐ Continued on the attached sheet.

_____
*Complainant's signature*

Lindsay Shaffer, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: June 4, 2019

_____
*Judge's signature*

City and state: Tampa, Florida

Thomas G. Wilson, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT
## OF CRIMINAL COMPLAINT

I, Lindsay Shaffer, after being duly sworn, depose and say as follows:

1.   I am commissioned as a Special Agent with the Drug Enforcement Administration (DEA) and have been so appointed since February 2012. I am presently assigned to the DEA Tampa District Office in the Middle District of Florida. My duties as a DEA Special Agent include the investigation of various criminal activities of narcotics traffickers and their associates.

2.   This affidavit is being submitted in support of a Criminal Complaint charging Rachel SMITH with Conspiracy to Distribute and Possess with Intent to Distribute Four-Hundred Grams or More of Fentanyl in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(vi). This affidavit does not contain all of the information pertaining to this investigation, and merely provides probable cause to issue a warrant for the defendant's arrest. I have personally participated in this investigation described below and am familiar with the information contained in this affidavit through my personal knowledge and information learned from others during the course of this investigation.

## PROBABLE CAUSE

3.   On May 8, 2019, at approximately 8:30 p.m., St. Petersburg Police Department (SPPD) Detective Samuel Brachna responded to Bayfront Medical

Center regarding a suspected opioid overdose victim (Victim 1[1]). After speaking with medical personnel, Detective Brachna learned the victim had been administered Naloxone (also commonly known as NARCAN[2]) by a first responder prior to being transported to the hospital. Victim 1 stated he/she purchased approximately 0.5 grams of what he/she believed to be a mixture of methamphetamine, heroin and Xanax from "Ray" for $80. Victim 1 stated he/she injected this mixture and subsequently overdosed. The remainder of this substance recovered from the overdose scene was sent to the Pinellas County Laboratory for testing. On May 29, 2019, the Pinellas County Laboratory reported the substance contained cocaine, heroin and fentanyl. Victim 1 described "Ray" as a black female in her 40s who drives a white Mercedes sedan and often wears wigs. Victim 1 stated on that date when he/she purchased the narcotics, "Ray" was wearing a yellow wig.[3]

---

[1] Victim 1 has several felony convictions, to include convictions for possession of controlled substances and battery on a law enforcement officer. Victim 1's information has been independently corroborated by law enforcement and he/she has made statements against his/her own personal interest. This leads me to believe Victim 1's information is truthful and reliable.

[2] Naloxone, also referred to as NARCAN, is a medication used to block the effects of an opioid overdose. Naloxone is commonly administered through the nasal passage. The effects of Naloxone typically begin two to five minutes after the medication is given.

[3] On April 30, 2019 SPPD detectives conducted surveillance on SMITH. During this surveillance SMITH was observed driving a white Mercedes C300 bearing Florida license plate 9687VB. SPPD Detective Brachna also noted SMITH was wearing what a appeared to be a yellow wig.

2

4.  On May 13, 2019, an SPPD Confidential Source (CS[4]) met with detectives and provided information to law enforcement about "Ray." The CS stated he/she began purchasing heroin from "Ray" in October 2018. The CS also admitted to overdosing multiple times from narcotics provided to him/her by "Ray." Based on the physical description provided by Victim 1, Detective Morgan showed the CS a Florida driver's license photo of SMITH who the CS positively identified as "Ray." The CS provided investigators with two cell phone numbers for SMITH, 727-268-1364 and 813-820-2823.

5.  On May 21, 2019, the CS purchased approximately 0.9 grams of a suspected heroin/fentanyl mixture from SMITH. At approximately 6:30 p.m. the CS, in the presence and at the direction of SPPD detectives, called SMITH, who was using cell phone number 813-820-2823. The CS asked to purchase approximately one gram of heroin from SMITH. SMITH told the CS she was available and the two exchanged multiple text messages ultimately agreeing to meet in the parking lot at 6570 66th Avenue North, Pinellas Park, Florida to conduct the deal.

---

[4] The CS has felony convictions that include possession of controlled substances, burglary, and evidence tampering. The CS is working with law enforcement in consideration of pending drug charges. The CS has provided information that has been independently corroborated by law enforcement and he/she has made statements against his/her own personal interest. This leads me to believe the CS's information is truthful and reliable. The CS admitted to investigators he/she provided SMITH with five of his/her prescription Adderall pills on May 21, 2019. Following the controlled phone call made to SMITH on June 3, 2019, the CS was deactivated as an SPPD CS.

3

6. The CS was equipped with an audio and video recording device, however, only the audio recording device captured the meeting. The CS was also given $200 of SPPD departmental funds. Detectives observed SMITH leave her residence, Location 1, at approximately 7:45 p.m. SMITH was driving a white Mercedes C300 (Vehicle 1). At approximately 7:58 p.m. SMITH met the CS in the parking lot of 6570 66th Avenue North, Pinellas Park, Florida. Detectives observed the CS enter SMITH's vehicle and exit approximately five minutes later. SMITH then left the area. Following the meeting, detectives met with the CS and retrieved a small plastic bag containing a white powdery substance. The CS stated he/she paid SMITH the $200 and SMITH handed him one bag containing a white powdery substance. On May 23, 2019, the Pinellas County Laboratory report stated the white powdery substance sold to the CS from SMITH contained both heroin and fentanyl. The CS told detectives he/she had a prescription for Adderall and during the meeting he/she gave SMITH five of his/her Adderall pills. The CS disclosed this information to investigators willingly and as such, was directed not to contact or see SMITH without being directed to do so by investigators.

7. On June 3, 2019, at approximately 2:15 p.m., ATF SA Cosentino observed SMITH exit Location 1 and enter Vehicle 1. SMITH was observed wearing what appeared to be a blue wig. DEA SA Hayley Hovhanessian observed SMITH travel to the east parking lot of 6570 66th Avenue North, St. Petersburg, Florida. SMITH appeared to meet with an unidentified male, and a short time later SA

Hovhanessian observed the unidentified male exit SMITH's front passenger seat. Agents maintained surveillance and observed SMITH travel back to her residence.

8. At approximately 2:20 p.m., at the direction and in the presence of detectives, the CS made a recorded phone call to SMITH who was using cell phone number 813-820-2823. The CS asked to purchase approximately two grams of heroin from SMITH. The CS and SMITH agreed to meet in the area of CVS, 5405 49th Street North, St. Petersburg, Florida.

9. At approximately 2:25 p.m., SA Cosentino observed SMITH exit her residence and enter the driver's seat of Vehicle 1. SA Hovhanessian maintaind surveillance on SMITH and observed her travel to 5637 49th Street North, St. Petersburg, Florida, just north of the CVS. SMITH parked in the parking lot south of this location. At approximately 2:30 p.m. agents approached SMITH's vehicle and took SMITH into custody without incident. Agents also detained Person 1, SMITH's front passenger without incident.

10. Following SMITH's arrest, agents conducted a probable cause search of the center console of Vehicle 1 and located multiple syringes containing an unidentified liquid substance. In the cupholder of the vehicle, which is located between the front driver and passenger seats, agents found two small plastic bags that contained a white powdery substance. Agents performed a presumptive field test on both bags using a TruNarc Handheld Narcotics Analyzer. The bags containing the white powdery substance collectively weighed two grams and tested positive as

5

fentanyl. SMITH was transported to the St. Petersburg Police Station for an interview.

11.     Prior to this interview, I read SMITH her *Miranda* rights in the presence of SPPD Detectives Morgan and Pagan. SMITH waived her *Miranda* rights and agreed to speak to law enforcement without an attorney present. I also advised SMITH the interview was being audio and video recorded and asked if she wanted the interview recorded. She stated she did and the recording equipment remained on during this interview. In sum and substance, SMITH provided the following information.

12.     SMITH stated she purchased what she believed to be heroin from a source of supply (SOS) in Los Angeles, California. SMITH stated she paid the SOS $1100 per ounce of what she believed to be heroin. SMITH stated she traveled to the area of CVS (5637 49th Street North, St. Petersburg, Florida) to sell two grams of what she believed to be heroin to one of her customers for $160. SMITH said she was holding the narcotics in her vehicle. I asked SMITH for consent to search her residence—SMITH signed a consent to search form for her residence, Location 1m as witnessed by Detectives Morgan and Pagan. I asked SMITH which room in the house was hers and she stated the bedroom on the left.

13.     At approximately 4:30 p.m. agents and detectives approach SMITH's residence and encountered SMITH's son Person 2. I asked which bedroom belonged to SMITH and he pointed out the bedroom on the left, past the living room. Of note, law enforcement only searched SMITH's bedroom, attached bathroom and closet;

no other areas of the house were searched. Agents found the following controlled substances in SMITH's bathroom, which is attached to the bedroom: All substances were later tested by detectives using the TruNarc Handheld Narcotics Analyzer.

    a.    On the bottom shelf of the bathroom closet, I and SGT Mathews located a Nike shoe box containing multiple plastic bags. One plastic bag contained 709 grams of fentanyl. Also in the Nike shoe box were multiple unknown pills and an unknown brown powder substance, all contained within their own bags.

    b.    On the second shelf from the bottom of the bathroom closet I and Group Supervisor (GS) Eric Savitts located a pink backpack containing multiple plastic bags, all further containing different substances. One plastic bag contained approximately 210 grams of fentanyl and a second plastic bag contained approximately 34 grams of methamphetamine. A third bag was found which contained an unknown brown powdery substance.

    c.    Under the sink I and GS Savitts located a small brown wooden box. Inside the box were multiple plastic bags all containing different substances. One bag contained approximately 15.8 grams of fentanyl, a second bag contained 19.4 grams of cocaine, a third bag contained 20 grams of 4-Chloroethcathinone[5] and 13 kits of Naloxone/NARCAN. Also in the brown box were multiple other plastic

---

[5] 4-Chloroethcathinone is a Schedule I controlled substance and is a stimulant and designer drug found in bath salts. The effects of this substance often mimic the effects of cocaine, methamphetamine or LSD.

7

bags containing unknown white powdery substances, unknown brown powdery substances, and an unknown gray powder.

      d.    Lastly, inside the bathroom closet I and GS Savitts found one money counter and a particle mask.

14.    All substances, both known and unknown, were sent to the Pinellas Count Laboratory for analysis and safekeeping. Also found in the bathroom next to the sink was one small scale which had a white residue on it, along with a plastic spoon also holding a white residue and multiple small plastic bags containing a white powdery substance residue, identical to those seized from SMITH's vehicle which contained the two grams of fentanyl. Two additional scales and a box of latex gloves were found under the sink, along with what appeared to be clear and brown plastic wrapping commonly used as wrapping for kilograms of fentanyl and heroin. I and SGT Mathews found a plastic bag containing a green leafy substance next to the sink. This substance later tested positive as spice. Also on the sink agents located one Duke Energy bill addressed to SMITH at Location 1 along with two bottles of prescription medication with SMITH's name on each bottle.

15.    In the bedroom closet, on the top shelf inside a black bag, agents found approximately $15,280 in U.S. currency. Also on the top shelf inside the closet, agents found three hand guns—one Smith and Wesson .40 caliber hand gun, one Walther PPK .380 caliber hand gun, and one Bersa Thunder Ultra Compact .45 caliber hand gun. In the right hand bottom drawer, agents found one CZP.09 .40

caliber hand gun and in the right hand side middle drawer, agents found one Smith and Wesson .380 caliber hand gun.

16.  I and Detectives Morgan and Pagan advised SMITH of what was found in her bedroom closet, bathroom and dresser drawers. SMITH stated the narcotics found in the bathroom belonged to her and she received them from the California-based SOS. SMITH stated she still owes the SOS approximately $10,000 for narcotics sent to her from the SOS. SMITH stated the five hand guns found in her bedroom belong to her and all five guns were purchased by her with what she believed to be heroin. Specifically, SMITH stated she provided one gram of heroin in exchange for each firearm. SMITH stated she used a mask and gloves to repackage the narcotics for street level sales. Lastly, SMITH stated she is the only one with access to her bedroom and locks the door when she is not in the residence. SMITH showed me two keys on her key ring and stated one is for the front door of her residence and the other is for her bedroom door.

17. Based upon the information contained in this affidavit, I submit there is probable cause to believe Rachel SMITH knowingly Conspired to Distribute and Possess with Intent to Distribute Four-Hundred Grams or More of Fentanyl in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(vi).

_____
Lindsay Shaffer, Special Agent
U.S. Drug Enforcement Administration

Sworn to and subscribed before me on
this ____ day of June, 2019.

_____
HONORABLE THOMAS G. WILSON
United States Magistrate Judge